**Jury Trial Demanded**
**CIVIL ACTION COMPLAINT**
**08 CV 7344 (WHP) ECF Case**

United States District Court
Southern District of New York
-------------------------------------------------x
Charlie Abney, Jerral Armstrong, Jarrell Ball, Karlos Beasley, Robert Beasley, Calvin Belton, Curtis Blount, Clarence Bright, Harvey Brown, Wymus Clausels, Johnny Dale, Antonio Denson, Tyrel Finklea, Carl Green, Carlos Hicks, Charles Hurst, Donald Johnson, Sylvester Johnson, Floyd Jones, Charles Kidd, Taquann Knight, James Lee, Frederic Left, Mark Lewis, Eddie Locke, James Marshall, Michael Mcmillian, Jonas Murphy, Leslie Packer, Admiyan Parker, Adrian Parker, Chris Parker, Darren Parker, Joseph Parker, Nicholas Parker, Reginald Richardson, Wilbert Richardson, Kevin Riley, Antwan Rivers, Lee Rivers, Christopher Scott, Quincy Scott, Chill Sigler, Lee Sigler, Lloyd Sigler, Timothy Sigler, Willie Lee Sigler, Jasper Smith, Mattie Smith, Tereyus Smith, Caning L. Snell, Kendrick Spencer, George Stots, Joe Stots, Joe Taite, Robert Walker, and Eddie Williams, Jr.,

                Plaintiffs,

  -against-

General Electric Company and
BHA Group, Inc.,

                Defendants.
-------------------------------------------------x

      Plaintiffs, by their counsel, Law Offices of Joshua Friedman, hereby complain as follows:

## Jurisdiction and Venue

1. This is a racial harassment case brought pursuant to 42 U.S.C. Sec. 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000 et seq. (hereinafter referred to as "Title VII"). This is also a Fair Labor Standards Act of 1938 (hereinafter referred to as "FLSA"), as amended, 29 U.S.C. §201, *et. seq.*, and applicable state law claims, brought for failure to pay overtime wages.

2. This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1343. Venue is proper in this jurisdiction based on the general venue statute, 28 U.S.C. Sec. 1391. Defendant General Electric is subject to personal jurisdiction in the Southern District of New York.

3. All plaintiffs filed charges of discrimination with the EEOC. On or after May 23, 2008, plaintiffs received copies of Notices of Right to Sue issued by the EEOC. This case was timely filed within 90 days of such receipt.

## Parties

4. The 57 Plaintiffs live in or around Monroeville, AL, with the exception of Calvin Belton, who lives in Milton, FL.

5. Plaintiffs are African-American. Most lack secondary education, they are poor and underemployed.

6. At all times relevant to the complaint, plaintiffs were "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. §203(e).

7. Defendant General Electric Company ("G.E.") is a publicly traded corporation headquartered in Fairfield, CT. It was founded by Thomas Edison in 1878. It does business in all of the United States.

8. Its businesses include Aircraft Jet Engines, Electricity, Entertainment, Finance, Gas Turbines, Power Generation, Industrial Automation, Lighting, Medical Imaging Equipment, Medical Software, Motors, Railway Locomotives and Wind Turbines.

9. In 2007, G.E. had a market capitalization of $369.569 Billion, and net income of $ 22.208 Billion.

10. At all times hereinafter mentioned, G.E. was an "employer" within the meaning of 42 U.S.C. 1981, Title VII, and the Fair Labor Standards Act.

11. Defendant BHA Group, Inc. ("BHA") is successor to Baghouse Associates, which was acquired by Defendant General Electric Company (G.E.) in 2004. BHA is operated by G.E. as part of its G.E. Energy division, an unincorporated business line within G.E.

12. G.E. contracts with industrial producers of effluent to change the bags, or filters, which collect the effluent (in baghouses, hence "Baghouse Associates"). G.E. also performs related services. Power producers emitting effluent are typical customers.

13. Changing baghouse bags is dangerous work. Effluent is highly toxic. It contains caustic chemicals such as lye, which can and does cause terrible burn injuries. Working conditions include extreme temperatures.

14. In or about 1992, Ray Lacy became a consultant and then a Technical Advisor ("TA") to BHA. As TA he was in charge of crews of men working in bag houses to change full bags for new and perform maintenance.

15. In or about 1996, Ray Lacy ceased working for BHA.

16. He started a business leasing workers to BHA, Lacy Enterprises.

17. From 1996 through 2004, when it became G.E., Lacy Enterprises leased laborers to work in bag houses to BHA.

18. At all times hereinafter mentioned, BHA was an "employer" within the meaning of 42 U.S.C. 1981, Title VII, and the Fair Labor Standards Act and state law..

## Facts

19. When BHA was acquired by G.E., Lacy Enterprises began contracting to lease workers directly to G.E.

20. Plaintiffs were at all times relevant herein employees of defendants, first BHA and then G.E.

21. Beginning in 1998, Lynn Dyer (Dyer) worked as a TA for BHA. When it was acquired by G.E., Dyer became a G.E. employee working in its Energy group. At all times relevant hereto, Dyer acted for BHA and G.E.

22. Plaintiffs desperately needed the employment provided by defendants and were therefore vulnerable to abuse.

23. Dyer was a vicious bigot who had a visceral hatred for African-Americans. He spewed his venom at Lacy Enterprises crews, who were all African-American, whenever he was assigned as TA on a job to which plaintiffs were leased.

24. He called them "niggers" and other racial slurs. He used racial slurs constantly when working with plaintiffs. He spoke openly and loudly about his contempt for African-Americans as workers. He openly stated his belief that African-Americans were inferior workers.

25. Examples of the racial abuse plaintiffs endured constantly under Dyer while

4

working for him on BHA and then G.E. jobs include but were not limited to:

a.  Commenting that "'black folks' don't work for no body, won't do nothing;"

b.  Getting right in plaintiffs faces, cussing, and calling them "stupid workers;"

c.  Stating, "you damn 'black ass niggers;'"

d.  Stating that plaintiffs "ain't worth a damn;'

e.  Telling plaintiffs they were not "too bright" and were "always slow to comprehend;"

f.  Commenting, "Ya'll 'niggers' ain't doing shit right;"

g.  Refusing to allow them to go to the bathroom, and threatening to fire them if they did;

h.  Condescending to plaintiffs and speaking to them like they were children;

i.  Threatening (and following through) that "'niggers' [are] getting fired, don't need 'niggers' for this;"

j.  Stating, "this is the last job ya'll 'niggers' be working on;"

k.  Stating, "this is your last job; I won't have to work with those 'niggers' no more;"

l.  Telling individual plaintiffs they were a "sorry black man;"

m.  Commenting that he did not want any more "black folks" or "niggers" working for him;

n.  Stating he did not want to work with plaintiffs' "skin color;"

o.  Calling plaintiffs "monkey boy;"

5

    p.    Telling plaintiffs he was "sick of these 'blacks;'"

    q.    Calling plaintiffs "boys" and "useless boys" in the racially derogatory sense;

    r.    Initially refusing to call an ambulance when Plaintiff Kevin Riley had a seizure;

    s.    Commenting, when Plaintiff OJ McMillan got sick and needed diabetic medicine, that he "didn't want no more 'Niggers' with him because he had to be taken to a doctor;"

    t.    Commanding, "'Boys' get your asses over here;"

    u.    Calling plaintiffs "Negro" to their face;

    v.    Making "jokes" like "nigger pants;" "'Big black sambo nigger,' his pants busted open."

26. These are only examples. Plaintiffs heard these and other racial remarks and slurs on a regular basis working for Dyer.

27. Dyer tortured plaintiffs, whom he deemed lazy because they are African-Americans, by denying them bathroom breaks, denying them injury breaks, and denying them rest breaks.

28. One of the vilest things he did was to Plaintiff Antonio Densen (Densen). Densen has third degree burns over most of his body. He has had numerous skin grafts. On a job for Dyer, his hands were cracking through his gloves and oozing bodily fluids. Instead of helping Densen with first aid, Dyer fired him, and the worker who had come to Densen's aid, and forced them to leave the work site immediately.

29. The racial abuse the plaintiffs endured on Dyer jobs was frequent. Some of the plaintiffs heard dozens of racial slurs from Dyer a week. The condescension and complaints about inferior working habits on jobs was constant. Dyer made it plain that he believed that African-Americans were inferior.

30. Plaintiffs observed Dyer working with white workers. Dyer treated them normally and professionally. He did not treat them with contempt or insult.

31. His speech to plaintiffs when he was not using racial slurs was a steady stream of insult and condescension.

32. Dyer combined his racial contempt with the power given to him by defendants to fire and deny work to plaintiffs. If he deemed one or more of the plaintiffs too lazy or inept due to his race, he would fire him, or send him home from a job, and instruct Lacy not to staff him on G.E. jobs again.

33. On the G.E. job sites, Dyer was the senior manager. There was no one senior to him to whom plaintiffs could appeal or grieve his personnel or worksite decisions.

34. Dyer determined when plaintiffs started and stopped working. He determined whether working conditions would be safe, and frequently made decisions which made them dangerous.

35. Dyer instructed plaintiffs as to what their assignments were each day.

36. Dyer told plaintiffs what they should wear ("no 'nigger pants'").

37. Dyer told plaintiffs what tools they should use.

38. Dyer imposed discipline on plaintiffs.

39. Dyer made their time sheets. He docked workers (withheld pay) for time he deemed not well spent.

40. Plaintiffs worked for Defendants on Defendants' job sites.

41. The frequency and aggressiveness of the racial abuse was such that it was torture for plaintiffs to work for Dyer. However, they were poor, and the G.E. work was the only work they had, so they endured it.

42. Plaintiffs lost work and suffered unspeakable humiliation because Dyer exercised his managerial authority based on his racist view that plaintiffs were inferior due to their race.

43. In or about 2005, Lacy began complaining to G.E. that Dyer was subjecting plaintiffs to racial slurs, firing them from jobs, denying them work, denying them rest, medical and bathroom breaks because he thought they were lazy, and generally abusing them because of the color of their skin.

44. These complaints fell on deaf ears. Dyer continued his abuse until he caused the termination of all plaintiffs in February 2007. Plaintiffs' race played a decisive role in his outright refusal to hire them again.

45. None of the plaintiffs has worked for G.E. since February 2007. As a result, they have been unemployed or seriously underemployed.

46. Plaintiffs have been traumatized by the experience of working for and being fired by Dyer. They are acutely aware of the fact that they were shamefully abused by Dyer because of their race and then fired by Defendants because of their race.

**Facts Relating To Overtime Claims**

47. Plaintiffs were employees of the defendants, working under the direct supervision of the defendants.

48. At all times hereinafter mentioned, plaintiffs were required to be paid overtime

pay at the statutory rate of time and one-half (1 and ½) their regular rate of pay after working forty (40) hours in a workweek.

49. Upon information and belief, plaintiffs worked more than forty (40) hours in most workweeks in which they were employed by the defendants.

50. Defendants failed to compensate plaintiffs for time worked in excess of forty (40) hours per week at a rate of a least one and one-half (1 and ½) times their regular hourly rate, throughout the term of employment with the defendants.

## Count One

### Hostile Work Environment In Violation of 42 U.S.C. 1981

51. Plaintiffs incorporate by reference paragraphs one through 50.

52. Defendants engaged in illegal discrimination on the basis of race by creating a hostile work environment to persist on jobs to which plaintiffs were assigned.

53. As a consequence of defendants' conduct, plaintiffs suffered severe emotional distress.

54. Defendants' actions proximately caused plaintiffs' injuries.

## Count Two

### Discriminatory Discharge In Violation of 42 U.S.C. 1981

55. Plaintiffs incorporate by reference paragraphs one through 54.

56. Defendants engaged in illegal discrimination on the basis by discharging plaintiffs on the basis of race.

57. Defendants engaged in illegal discrimination by interfering with plaintiffs' employment when Defendants terminated its relationship with Lacy Enterprises.

58. As a consequence of defendants' conduct, plaintiffs suffered severe emotional distress.

59. Defendants' actions proximately caused plaintiffs' injuries.

## Count Three

### Hostile Work Environment In Violation of Title VII

60. Plaintiffs incorporate by reference paragraphs one through 59.

61. Defendants engaged in illegal discrimination on the basis of race by creating a hostile work environment to persist on jobs to which plaintiffs were assigned.

62. As a consequence of defendants' conduct, plaintiffs suffered severe emotional distress.

63. Defendants' actions proximately caused plaintiffs' injuries.

## Count Four

### Discriminatory Discharge In Violation of Title VII

64. Plaintiffs incorporate by reference paragraphs one through 63.

65. Defendants engaged in illegal discrimination on the basis by discharging plaintiffs on the basis of race.

66. Defendants engaged in illegal discrimination by interfering with plaintiffs' employment when Defendants terminated its relationship with Lacy Enterprises.

67. As a consequence of defendants' conduct, plaintiffs suffered severe emotional distress.

68. Defendants' actions proximately caused plaintiffs' injuries.

## Count Five

### Failure to Pay Overtime Wages In Violation of The FLSA

69. Plaintiffs incorporate by reference the allegations contained in paragraphs one through 68.

70. Defendants employed plaintiffs for workweeks longer than forty (40) hours and wilfully failed to compensate the plaintiffs for the time worked in excess of forty (40) hours per week, at a rate of at least one and one-half (1 and ½) times the regular hourly rate, in violation of the requirements of Section 7 of the FLSA, 29 U.S.C. §207(a)(1).

71. The complete records concerning the number of hours worked by the plaintiffs as well as the compensation plaintiffs received in workweeks in which excess hours were worked are not in plaintiffs' possession and control, and as such, the plaintiffs are unable to state at this time the exact amount due and owing to them.

72. Defendants failure and refusal to pay plaintiffs' overtime compensation violates FLSA, 29 U.S.C. §201, *et. seq.*

73. As a consequence of the willful underpayment of wages, alleged above, the plaintiffs have incurred damages thereby and the defendants are indebted to them in the amount of the unpaid overtime compensation, together with interest and liquidated damages, in an amount to be determined at trial.

### JURY DEMAND

Plaintiffs herein demand a trial by jury for all issues in this action.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, ALL OF THEM, respectfully requests:

a. Judgment against defendants for violation of 42 U.S.C. 1981;

b. Judgment against defendants for violation of 42 U.S.C. 2000;

c. Judgment against defendants for violation of 29 U.S.C. §201, *et. seq.;*

d. Compensatory damages for emotional distress;

e. Compensatory damages in the form of lost wages;

f. Punitive damages;

g. Plaintiffs' unpaid back wages at the applicable overtime rate;

h. An equal amount to the overtime wage damages as liquidated damages;

i. Judgment against defendant that its violations of the FLSA were willful;

j. To the extent liquidated damages are not awarded, an award of prejudgment interest;

k. All costs and attorneys' fees incurred prosecuting these claims; and

f. For such further relief as the Court deems just and equitable.

Dated: August 19, 2008
      Larchmont, NY

                              THE LAW OFFICE OF JOSHUA FRIEDMAN

                              _____
                              BY: Rebecca Houlding (RH 8107)
                                    Joshua Friedman
                                    Daniella Nanau
                                    25 Senate Place
                                    Larchmont, NY  10538
                                    (212) 308-4338